UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEITH T. ROBINSON,

    Petitioner,

v.

PAUL KLEE,

    Respondent,
_____/

Civil No. 2:15-CV-11007
HONORABLE NANCY G. EDMUNDS
UNITED STATES DISTRICT JUDGE

**OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS
AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY OR LEAVE TO
APPEAL *IN FORMA PAUPERIS***

Keith T. Robinson, ("Petitioner"), confined at the Gus Harrison Correctional Facility in Adrian, Michigan, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, through his attorneys at the Michigan Innocence Clinic, in which he challenges his conviction for first-degree premeditated murder, M.C.L.A. 750.316; two counts of assault with intent to commit murder, M.C.L.A. 750.83; and possession of a firearm in the commission of a felony, M.C.L.A. 750.227b. For the reasons that follow, the petition for writ of habeas corpus is **DENIED**.

**I. Background**

Petitioner was convicted of the above offenses following a jury trial in the Wayne County Circuit Court. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals in denying petitioner's post-conviction appeal, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

1

## I. FACTS AND PROCEDURAL HISTORY

On July 1, 1995, Ajena Sims was shot to death while walking upstairs to her apartment in a house at 13625 Trumbull in Highland Park. Durrell Sims, the decedent's husband, and a family friend, Collins Dingle, testified that they left the apartment at approximately 11:00 a.m. to make a telephone call at a nearby convenience store and Mrs. Sims was alive when they left. Mr. Sims and Mr. Dingle testified that, as they were returning to the apartment, defendant confronted them in an alley. They further testified that defendant fired a shot into Mr. Sims's chest and fired several shots in Mr. Dingle's direction as he fled the scene. Mr. Sims was able to get up to run and defendant fired another shot in his direction, this time missing him. At trial, evidence showed that the shots that killed Mrs. Sims and those that injured Mr. Sims came from the same firearm. The police responded to the shooting of Mr. Sims at approximately 11:30 a.m., and he was taken to a hospital for immediate surgery. Trial evidence also showed that, a few days earlier, Mr. Sims had a confrontation with defendant after Mrs. Sims complained that defendant had been flirting with her and had grabbed her. During the physical altercation between Mr. Sims and defendant, defendant reached for a gun, but Mr. Sims took the gun away from him. The record does not reveal what happened to that gun.

At trial, defendant presented an alibi defense, and witnesses testified that he was at a baseball game in Detroit when the crimes occurred. Defendant's brother testified that, on July 1, 1995, he and defendant went to the baseball field with their mother just before 10:00 a.m., and that defendant sat in the car until the games ended at around noon. Ike Orton testified that he met defendant for the first time at the ballpark on July 1, 1995, around 1:00 p.m., when he talked to defendant's mother in the parking lot after the games. Defendant's mother, Marsha Ross, confirmed that defendant was with her at the baseball games, that he stayed in the car the whole time, and that she talked to Mr. Orton after the games until about 1:00 p.m. She also testified that they then went to a grocery store, and arrived home around 2:00 p.m.

The prosecution presented the ballistics evidence showing that the bullets that injured Mr. Sims and killed Mrs. Sims came from the same weapon, though the gun was never found. The prosecutor also presented other witness testimony, including the identification of defendant by Mr. Sims, Mr. Dingle, and Michael Ware, who was 14 years old and lived at 13708 Trumbull, three houses from the Sims's apartment house. Mr. Ware testified that he knew who defendant was, that defendant lived three houses away from him, and that, on two or three occasions, he had seen defendant argue with a woman in front of another house on Trumbull. Mr. Ware further testified that, at approximately 11:45 a.m. on the day of the murder, he saw defendant walking quickly down Trumbull while looking over his shoulder. According to Mr.

> Ware, defendant walked to the same house on Trumbull where he had seen defendant argue with the woman. Mr. Ware recalled that defendant had a black gun in his right hand, defendant entered the house, Mr. Ware heard three or four gunshots, and defendant ran out of the house and across a field. Mr. Ware stated that the police arrived within four or five minutes, and he later identified defendant from photographs at the police station.
>
> In 1996, a jury convicted defendant of first-degree murder, two counts of assault with intent to murder, and felony-firearm. Defendant challenged his convictions on appeal and argued that the prosecutor intentionally excluded African Americans from serving on his jury, the court erroneously excluded evidence of domestic violence between Mr. and Mrs. Sims, and that the trial court improperly prohibited defense counsel from using a hat for demonstrative purposes during closing arguments. In *People v. Robinson*, unpublished amended opinion per curiam of the Court of Appeals, issued August 26, 1997 (Docket No. 195877), this Court rejected all of defendant's claims of error and affirmed his convictions. On May 28, 1998, our Supreme Court denied defendant's application for leave to appeal. *People v. Robinson*, 457 Mich. 882; 586 NW2d 924 (1998).
>
> In 2009, through the Michigan Innocence Clinic, defendant filed a motion for relief from judgment pursuant to MCR 6.508(D). Defendant claimed that he was denied the effective assistance of counsel and that he obtained newly discovered evidence concerning the time of Mrs. Sims's death. The trial court denied defendant's motion, and defendant filed a delayed application for leave to appeal in this Court. This Court denied defendant's application, but our Supreme Court remanded the case as on leave granted. *People v. Robinson*, 490 Mich. 988; 807 NW2d 165 (2012). In this Court, defendant filed a motion to remand the case for an evidentiary hearing, which this Court initially denied. *People v. Robinson*, unpublished order of the Court of Appeals, issued March 27, 2012 (Docket No. 298929). However, on reconsideration, this Court granted defendant's motion to remand, in part, in an unpublished order. *People v. Robinson*, unpublished order of the Court of Appeals, issued April 23, 2012 (Docket No. 298929). This Court ordered the trial court to conduct an evidentiary hearing, limited to the issues raised in the motion to remand, and "to make findings of fact and a determination on the record." *Id.*
>
> On remand, the trial court took testimony from various witnesses, considered the arguments of counsel, and again denied defendant's motion for relief from judgment in a ruling from the bench. Defendant challenges the trial court's ruling on appeal.

*People v. Robinson*, No. 298929, 2013 WL 5762991, at *1-2 (Mich. Ct. App. Oct. 24, 2013).

The Michigan Court of Appeals upheld the trial court's denial of the motion for relief

3

from judgment and the rejection of the ineffective assistance of counsel claims. *Id., lv. den.* 495 Mich. 989; 844 N.W. 2d 721 (2014); *reconsideration den.* 496 Mich. 869; 849 N.W. 2d 362 (2014); *cert. den. Sub nom Robinson v. Michigan,* 135 S. Ct. 965 (2015).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. Mr. Robinson's trial counsel rendered ineffective assistance of counsel by failing to interview Krystyan Anderson, a known scene witness, and by failing to investigate/present the medical evidence pertaining to time of death.

II. Appellate counsel rendered ineffective assistance by failing to investigate and litigate ineffective assistance of trial counsel on the issue of true time of death, using both Anderson's account and the medical evidence.

## II.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the

4

law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010)((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)(*per curiam*)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* In order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Harrington,* 562 U.S. at 103.

### III.  Discussion

#### A.  The statute of limitations issue.

Respondent contends that petitioner's claims are barred by the one year statute of limitations contained within 28 U.S.C. § 2244(d)(1).  Petitioner replies that the claims are not time barred because they are based on newly discovered evidence.  In the alternative, petitioner advances various reasons to equitably toll the limitations period.

Although the issue of whether a claim is procedurally barred should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits [of a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo,* 169 F. 3d 1155, 1162 (8th Cir. 1999)(internal citations omitted).  Because the statute of limitations does not constitute a jurisdictional bar to habeas review, a federal court, can, in the interest of judicial economy, proceed to the merits of a habeas petition. *See Smith v. State of Ohio Dept. of Rehabilitation,* 463 F. 3d 426, 429, n. 2 (6th Cir. 2006)(quoting *Trussell v. Bowersox,* 447 F. 3d 588, 590 (8th Cir. 2006)).  Simply put, this Court need not resolve the dispute over the timeliness of petitioner habeas application.  Assuming without deciding that the current petition was timely, petitioner's habeas application fails on the merits. *See Ahart v. Bradshaw,* 122 Fed. Appx. 188, 192 (6th Cir. 2005).

#### B.  The procedural default issue.

The respondent contends that petitioner's claims are procedurally defaulted because

he raised them only for the first time in his post-conviction motion for relief from judgment and failed to show cause and prejudice, as required by Mich.Ct.R. 6.508(D)(3), for failing to raise these claims in his appeal of right.

Petitioner claims that his appellate counsel was ineffective for failing to raise his ineffective assistance of trial counsel claim on his direct appeal. Ineffective assistance of counsel may establish cause for procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). If petitioner could show that he received ineffective assistance of appellate counsel that rose to the level of a Sixth Amendment violation, it would excuse his procedural default for failing to raise his claims on his direct appeal in the state courts. *Seymour v. Walker*, 224 F. 3d 542, 550 (6th Cir. 2000). Given that the cause and prejudice inquiry for the procedural default issue merges with an analysis of the merits of petitioner's defaulted claims, it would be easier to consider the merits of his ineffective assistance of trial counsel claim. See *Cameron v. Birkett,* 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004). Moreover, petitioner could not have procedurally defaulted his ineffective assistance of appellate counsel claim, because state post-conviction review was the first opportunity that he had to raise an ineffective assistance of appellate counsel claim. *See Guilmette v. Howes*, 624 F. 3d 286, 291 (6th Cir. 2010).

### C. The ineffective assistance of counsel claims.

Petitioner alleges that trial counsel was ineffective for failing to present evidence to establish that the murder victim's time of death took place hours before the official time of death. Petitioner claims that an earlier time of death would establish that the murder victim's husband, who had a history of domestic violence towards his wife, was the actual killer. Petitioner further alleges that appellate counsel was ineffective for not raising trial

counsel's ineffectiveness on the appeal of right.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "*Strickland*'s test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011)(quoting *Harrington*, 562 U.S. at 112). The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009). The *Strickland* standard applies as well to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt,* 395 F. 3d 602, 617 (6th Cir. 2005).

More importantly, on habeas review, "the question 'is not whether a federal court

believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. at 101. Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664). Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.* This means that on habeas review of a state court conviction, "[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."*Harrington*, 562 U.S. at 101. "Surmounting *Strickland's* high bar is never an easy task." *Id.* at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

> Because of this doubly deferential standard, the Supreme Court has indicated that:
>
> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel' s actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter*, 562 U.S. at 105.

In addition, a reviewing court must not merely give defense counsel the benefit of the doubt, but must also affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did. *Cullen v. Pinholster,* 563 U.S. 170, 196

(2011).

Finally, this Court is aware that "[R]eliance on 'the harsh light of hindsight' to cast doubt on a trial that took place" twenty years ago and an appeal of right that took place over eighteen years ago "is precisely what *Strickland* and AEDPA seek to prevent." *Harrington v. Richter*, 562 U.S. at 107.

In his motion and at the evidentiary hearing before the trial judge, petitioner argued that Mrs. Sims must have died between 9:00 and 10:00 a.m. on July 1, 1995, rather than later, as witnesses testified at trial. Petitioner presented the testimony of Dr. Jeffrey Jentzen, an expert in forensic pathology. Dr. Jentzen testified that, based primarily on the emergency medical technician's (E.M.T.) notation that Mrs. Sims showed signs of lividity in her hands when first examined at the scene at 12:07 p.m., she could not have died after 11:00 a.m. when Mr. Sims and Mr. Dingle testified that they left the apartment. Dr. Jentzen also noted that the ambulance runsheet indicated that Ms. Sims's skin condition was cool and that it would be unusual for a body to be cool to the touch within an hour of death. Dr. Jentzen testified that it was more plausible that Ms. Sims died between 9:30 and 10:00 a.m. (Tr. 5/24/12, pp. 13-14, 17, 21-22, 26, 34, 37). [1]

Petitioner also presented the testimony of Krystyan Anderson, who was 11 years old when the crime occurred. Anderson lived in the apartment below the Sims's residence and was home alone with his younger brother when he heard noises coming from the stairway up to the Sims's apartment. Mr. Anderson testified that he heard Ms. Sims repeatedly tell someone to "shut up," before hearing three "pops" that "sounded like a stick hitting the

---

[1] The trial transcript from May 24, 2012 was incorrectly listed as the transcript for 5-24-2002 and can be found at Docket Entry 5-11 of this Court's docket. See also Docket Entry 9.

10

stair." Anderson also heard someone who sounded like Ms. Sims repeatedly say "ouch." Mr. Anderson talked to the police, but did not speak to any lawyers until the Michigan Innocence Clinic contacted him in 2009. Mr. Anderson testified that he heard the noise in the stairwell while watching a television program called "Reboot" which aired at 9:30 or 10:00 a.m., which was confirmed by the television listing on that date. (Tr. 6/11/12, pp. 5-12, 17-18, 21-30). On cross-examination, Mr. Anderson testified that he could not remember anything about the particular episode of Reboot or the other television programs he watched on the morning of the shooting, nor could he recall what time his mother left for work that morning. (*Id.,* pp. 17-18, 30).

Significantly, petitioner also presented the testimony of Michael Ware, who now recanted his identification of petitioner as the person he saw going into the Sims' apartment. Ware acknowledged that he was now an inmate who had prior convictions for receiving and concealing stolen property and embezzlement. (Tr. 6/11/12, pp. 33-41). On cross-examination, Ware acknowledged that the police did not force him to falsely implicate petitioner. Ware admitted that he had nothing to gain at the time from implicating petitioner and did so simply because "it was the right thing to do." (*Id.,* p. 42). Although Ware now claimed that he did not see the face of the person running down the street, he acknowledged that his parents at the time contacted the police to arrange for Ware to speak with them. (*Id.,* p. 53). Significantly, Ware did not recant his testimony that it was approximately 11:45 a.m. when he heard the shooting.

Wayne County Medical Examiner Dr. Carl Schmidt disagreed with Dr. Jentzen's opinion. Dr. Schmidt testified that it was doubtful that the E.M.T.s could accurately assess the lividity in Ms. Sims' hands even if they showed lividity, but even if her hands exhibited

lividity, this could happen in minutes after death, not hours. Dr. Schmidt pointed to literature from several respected forensic pathologists that showed that liver mortis could happen within twenty minutes to half an hour after death. (Tr. 6/27/12, pp. 28-29). Dr. Schmidt also testified that the relevant medical literature indicates that skin temperature is not a scientific basis for determining the time of death, only internal measurements are accurate. (*Id.,* pp. 11, 32-33, 55). Dr. Schmidt pointed out that a person who gets shot will have cool skin even before they die because blood gets rerouted to vital organs or leaks out of the body. The ambulance run sheet for surviving gunshot victim Durrell Sims showed that his skin was cool. (*Id.,* pp. 31-32). Even Dr. Jentzen admitted that skin cools faster than the core of the body and that exposed skin would cool faster than covered skin. (Tr. 5/24/12, pp. 22-24).

Dr. Schmidt and Dr. Jentzen both agreed that it would take at least two to three hours for a dead body to become stiff to the touch. (Tr. 5/24/12, pp. 33-34, Tr. 6/27/12, p. 36-37). Dr. Jentzen had started counting backwards from 12:30 p.m., but the "stiff to touch" finding was not made until 1:30 p.m., if not later. (Tr. 6/27/12, pp. 5, 26-27, 36-37; See also Wayne County Medical Examiner's Report, attached as Attachment A to Plaintiff-Appellee's Brief on Appeal [Dkt. # 5-26]). Dr. Jentzen admitted that the EMS report for Ms. Sims did not mention any rigor mortis at the time that they rolled the victim over. (Tr. 5/24/12, p. 20).

Dr. Schmidt opined that Ms. Sims could have been alive as late as 11:30 a.m. that morning. (*Id.,* pp. 37-38).

The Michigan Court of Appeals rejected petitioner's ineffective assistance of trial counsel claim:

Defendant contends that defendant's trial counsel and appellate counsel should have better investigated the time of Mrs. Sims's death and talked to and presented the testimony of Mr. Anderson at trial and on appeal. However, in light of the evidence presented at trial, it was clearly sound trial strategy for defense counsel to present an alibi defense. As discussed, Mr. Ware testified that the shooting inside the Sims's apartment occurred at approximately 11:45 a.m., and he specifically stated that defendant entered the apartment with a gun right before shots were fired, and that defendant ran out immediately afterward. While Mr. Ware now claims that he could not actually identify defendant as the person who entered the apartment, he again testified that he heard the shooting and that it occurred minutes before police arrived at the Sims's residence, which was at approximately 11:50 a.m. At trial, Mr. Sims and Mr. Dingle testified that they left the apartment at 11:00 a.m. and that Mrs. Sims was alive. Both also testified that defendant ambushed them in a nearby alley while they were on their way home, verbally confronted defendant about their prior altercation involving Mrs. Sims, and then shot Mr. Sims and shot at Mr. Dingle. Evidence also showed that defendant chased Mr. Dingle as he tried to run from the scene. Medics arrived to assist Mr. Sims at approximately 11:30 a.m. And, as noted, the bullets used to injure Mr. Sims and to kill Mrs. Sims came from the same weapon.

Again, to establish ineffective assistance of counsel, "'[a] defendant must overcome the strong presumption that his counsel's action constituted sound trial strategy under the circumstances.'" *People v. Buie*, 491 Mich. 294, 311; 817 NW2d 33 (2012), quoting *People v. Toma*, 462 Mich. 281, 302; 613 NW2d 694 (2000). Again, in light of the evidence presented at trial, it was clearly sound trial strategy for counsel to use the alibi defense. The timeline of events was not the focus of the prosecution or the defense at trial, and defense counsel had three witnesses who testified that defendant was elsewhere when trial evidence showed the crime occurred. While counsel is required to make a reasonable investigation of the case, counsel easily could have concluded that the information Mr. Anderson provided to the police would not assist the defense. Rather, under the circumstances, it was a reasonable decision not to obtain testimony from Mr. Anderson, who was a child at the time of the crime, when the alibi defense made his input unnecessary. *Strickland*, 466 U.S. at 690–691. Indeed, had defense counsel elicited testimony from Mr. Anderson that he heard something occur earlier in the morning, or evidence that Mrs. Sims died earlier based on the EMT's notation of lividity, it would have been reasonable to suppose that the evidence would be rebutted by other lay and expert testimony, as occurred during the evidentiary hearing. More importantly, however, had defense counsel relied on a theory that Mrs. Sims died earlier, defendant's whereabouts were not accounted for before 10:00 a.m. Rather, defendant's alibi took him away from the area between 10:00 a.m. and at least 1:00 or

13

> 2:00 p.m., which was consistent with the trial evidence regarding when the crimes occurred. But even if he could also establish an alibi to cover an earlier time of death for Mrs. Sims, as the trial court clearly recognized, it would have been strategically unsound for counsel to rely on the theory specifically posed by counsel here in arguing the motion for relief from judgment: that (a) Mr. Sims killed his wife earlier that morning while she was walking up the stairs to the apartment, (b) Mr. Sims shot himself or had someone shoot him in the middle of his chest with the same weapon in an alley down the street, and (c) Mr. Sims then staged a chase down the street by Mr. Dingle and some other man holding a gun.
>
> And, while defendant also makes the point that he does not have to offer a theory of what actually happened, but merely that counsel should have done more investigation to pinpoint the time of death, if evidence showed defendant was several miles away from the crime scene when trial evidence showed Mrs. Sims died, it was entirely logical for counsel, at trial and on appeal, to rely on that fact. Moreover, it is well-settled that "decisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *People v. Dunigan*, 299 Mich. App 579, 589–590; 831 NW2d 243 (2013). Here, no evidence suggests that counsels' performance fell below an objective standard of reasonableness. Accordingly, defendant failed to show ineffective assistance of counsel and failed to show good cause for the trial court to grant his motion for relief from judgment.

*People v. Robinson*, 2013 WL 5762991, at *4-5.

Petitioner is not entitled to relief on his claim for several reasons.

First, trial counsel cross-examined the medical examiner about his inability to pinpoint the specific time of Ms. Sims's death. The medical examiner, in fact, indicated that he could not pinpoint the time of death "very well" and could only testify that it appeared to be within "the previous twelve hours [of the autopsy]." (Tr. 3/27/96, p. 125). Trial counsel later argued in closing argument that the coroner was unable to pinpoint the specific time of death and argued "How do we know when and where this young lady was shot?" (*Id.*, p. 236).

The Supreme Court has noted that: "[I]n many instances cross-examination will be

14

sufficient to expose defects in an expert's presentation." *Harrington v. Richter,* 562 U.S. at 111. Defense counsel's decision to cross-examine the medical examiner, instead of calling defense witnesses to establish an earlier time of death, was a reasonable trial strategy that defeats petitioner's ineffective assistance of trial counsel claim. *See Tinsley v. Million,* 399 F.3d 796, 806 (6th Cir. 2005).

Secondly, trial counsel presented several alibi witnesses to testify that petitioner was with them from approximately 10:00 a.m. until 2:00 p.m. the day of the shootings. The testimony at trial established that Durrell Sims was shot at about 11:15 a.m. and his wife was shot and killed at approximately 11:45 a.m. Petitioner's alibi, if believed, would have absolved him of these crimes. Moving the timeline of the murder to before 10:00 a.m. would have undermined petitioner's alibi. Counsel was not ineffective for failing to present evidence that would have undermined or destroyed petitioner's alibi defense. *See, e.g., Neal v. Acevedo*, 114 F.3d 803, 805–06 (8th Cir.1997)(trial counsel's failure to take actions inconsistent with defendant's alibi defense held not constitutionally ineffective); *Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008)(unreasonable for counsel to present expert who will contradict the sole defense theory and render worthless other helpful testimony); *Cathron v. Jones*, 190 F. Supp. 2d 990, 1000-01 (E.D. Mich. 2002)(counsel not ineffective in failing to request instruction on accessory after the fact, as this would have undermined the petitioner's alibi defense).

Thirdly, there were a number of problems with petitioner's theory that the shooting happened earlier than 10:00 a.m. Dr. Schmidt testified that skin temperature is not an accurate method for determining time of death. More importantly, a person who gets shot will have cool skin even before they are dead. The ambulance run sheet for Durrell Sims,

the surviving victim, shows that his skin was cool, even though he was still alive. Thus, the fact that Ms. Sims's skin was cool would not necessarily suggest an earlier time of death. Dr. Schmidt also testified that lividity could occur within twenty to thirty minutes of death. Relevant forensic pathology literature supported Dr. Schmidt's testimony. Again, the fact that Ms. Sims' hands showed signs of lividity does not conclusively prove an earlier time of death. Both Dr. Schmidt and Dr. Jentzen indicated it would take from two to three hours for a dead body to became rigid. Dr. Jentzen counted backwards three hours from 12:30 p.m. to 9:30 a.m. to estimate an earlier time of death for Ms. Sims. The stiff to touch finding, however, was not made until at least 1:30 p.m. Thus, it was possible for Ms. Sims to have been shot at 11:30 a.m. With respect to Krysytan Anderson, the trial judge ruled that his testimony would not have made a difference at trial because he could not remember what the Reboot episode that he was watching was about nor could he remember the other shows he watched that day. The judge noted that Anderson could not even remember what time his mother left home or when the police arrived. (Tr. 12/11/12, p. 15). In contrast to this testimony, there was testimony from Michael Ware that he witnessed petitioner go into the Sims' house at about 11:45 a.m. while armed with a weapon and heard shots fired. Although Ware has now recanted his identification of petitioner as the person he saw with the firearm, he never recanted the time that he witnessed the armed suspect going into the house.

Based on the evidence presented at trial, coupled with lack of evidence to support petitioner's argument, this Court concludes that trial counsel was neither deficient for failing to challenge the timeline of the murder nor was petitioner prejudiced by trial counsel's failure to do so. *See Cowans v. Bagley*, 624 F. Supp. 2d 709, 795 (S.D. Ohio 2008); *aff'd*,

639 F.3d 241 (6th Cir. 2011).

Finally, there was absolutely no evidence to support petitioner's theory that Durrell Sims was the person who murdered his wife. In fact, such a defense would have been somewhat outlandish because it would have required trial counsel to argue that Durrell Sims shot and killed his wife and then went to an alley ninety minutes later with the same gun that was used to kill his wife, before either shooting himself, or having someone else shoot him, in the xiphoid, which is in the middle of the chest, where the heart, liver, and diaphragm are located. Such a wound would have been life threatening. (Tr. 6/27/12, p. 41-42). Sims would then have had to chase his friend Collins Dingle down the street while suffering from this severe wound. Since there was no evidence linking Durrell Sims to the murder of his wife, trial counsel was not ineffective in failing to pursue a third party culpability defense. *See e.g. Robins v. Fortner,* 698 F. 3d 317, 331 (6th Cir. 2012). Trial counsel was not ineffective.

In his second claim, petitioner contends that appellate counsel was ineffective for failing to raise his ineffective assistance of trial counsel claim on his direct appeal.

The Sixth Amendment guarantees a defendant the right to the effective assistance of appellate counsel both on appeals of right, *See Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985), and on first-tier discretionary appeals. *Halbert v. Michigan*, 545 U.S. 605, 609–10 (2005). However, court appointed counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Because petitioner has failed to show that his trial counsel was ineffective, petitioner is unable to establish that appellate counsel was ineffective for failing to raise his ineffective assistance of trial counsel claim on his direct appeal. *See e.g. Fautenberry v.*

*Mitchell,* 515 F. 3d 614, 642 (6th Cir. 2008). Petitioner is not entitled to relief on his second claim.

### IV. Conclusion

The Court will deny the petition for writ of habeas corpus with prejudice. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; *See also Strayhorn v. Booker,* 718 F. Supp. 2d 846, 875 (E.D. Mich. 2010).

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. *See Allen v. Stovall,* 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001). The Court will also deny petitioner leave to appeal *in forma pauperis*, because the appeal would be frivolous. *Id.*

### IV. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED.**

IT IS FURTHER ORDERED that Petitioner will be **DENIED** leave to appeal *in forma pauperis.*

                                                  s/ Nancy G. Edmunds
                                                  **HON. NANCY G. EDMUNDS**
                                                  UNITED STATES DISTRICT COURT

Dated:  January 28, 2016